Price, J.
The trial court refused to direct a verdict for the defendant at the close of plaintiff’s evidence, and also refused to direct such a verdict at the end of all the evidence introduced by the parties. The overruling of these motions for a verdict was held, at general term, to be error, and such error was one of the grounds for reversing the judgment 'rendered at special, term. The plaintiff in error, Bell, complains *15 of the holding at general term on this subject, and this condition of the record has imposed upon us the duty of considering the nature and effect of the evidence submitted to the jury. Did the court err in declining to direct a verdict when plaintiff rested his case? If not then, did it err in not sustaining the motion for the same purpose made at the end of all the evidence?
A proper determination of these questions does not involve the discussion and weighing of all kinds of testimony found in the record, such as goes to the character and extent of the very serious injuries received by the plaintiff when the box of capsq exploded in his hand — the history of his connection with the Cincinnati workhouse — the duties cast upon its different officers and employes, and the subsequent history of plaintiff’s wounds. We have not disregarded such evidence, but it is not necessary to a decision that it be made the subject of comment in this opinion.
The important question raised in the record is, who is responsible for the great injuries admittedly sustained? The solution of the question depends on the conduct and acts of Bell himself; attending the explosion, and also upon the capacity in which the city was acting in employing him and assigning to him his duties in the discharge of which he claims he was injured.
On or about the 6th of July, 1903, he was made a guard in one of the shops of the Cincinnati workhouse. This workhouse is on Colerain avenue. There were various shops connected with it and inside the walls of the workhouse *16 grounds. It was his duty to have charge and control of prisoners placed under his care and to. oversee their conduct at work, report misconduct to the foreman, and perform other duties incident to the position of a workhouse guard.
In addition to these workhouse shops, the city had control of a stone quarry on Clifton avenue near Burnet Woods Park, and about two miles, from the city workhouse, but inside the corporate limits of Cincinnati. In about two years after Bell had been made a workhouse guard, and after having served that long in that capacity, he was. made sergeant at the stone quarry, and entered upon the discharge of the duties of that office. The keys of the shéd called the powder house were turned over to him, and he was in charge of the taking of prisoners from the workhouse quarters to the quarry — see that none escaped and that they performed the tasks set before them, and return them to prison in the evening.
In order to facilitate the work of quarrying stone, drilling and blasting were resorted to, and this work was under the supervision of Bell, and in the shed for which he held the keys, the powder, dynamite, and other high explosives for use in blasting, were stored. On the 22d of September, 1905, over two months after beginning service as quarry sergeant, he received the injuries complained of while attempting to open a box of caps at the shed. These caps were to-be used in making a blast in the quarry.
The plaintiff asserts that he had received no-instructions or warnings as to the dangerous and explosive character of these caps, and had *17 no knowledge or experience on the subject prior to his injury, although the officers of the workhouse over him had such knowledge which they should have imparted to him.
For the present we will not further consider the position and conduct of the plaintiff, and pass to a consideration of the capacity in which the city acted in employing this sergeant of the quarry and the legal relation which the city sustained to the workhouse and of course the quarry which was being used as a part of the workhouse. When plaintiff was employed as quarry sergeant and assigned to duty, was the city acting in a governmental, or proprietary capacity? Was the workhouse — its various shops and the quarry on the hills being operated by the city government as a part of its governmental work under the statutes of the state — attempting to discharge duties to the public, made so by positive law? Or was it conducting a business for profit, making use of the workshops and the quarry to that end as an ordinary proprietor would do for personal or private gain? If the relation the city bore to the workhouse and quarry was governmental, and their operation and control were the exercise of governmental power, the city is not liable to plaintiff, even if he was injured through the neglect and want of care of some other or superior officer of the institution, where the statute creates no such liability. This has been held in numerous cases, such as Western College v. Cleveland, 12 Ohio St., 375; Wheeler v. Cincinnati, 19 Ohio St., 19; City of Cincinnati v. Cameron, 33 Ohio St., 336; *18 Robinson v. Greenville, 42 Ohio St., 625; Frederick, Admx., v. Columbus, 58 Ohio St., 538. We therefore proceed to learn the legal attitude of the city towards its workhouse and its prisoners, and this we gather from several sections of the Revised Statutes. Paragraph 20 of Section 7, Municipal Code, invests municipal corporations with authority “to establish, erect, maintain and regulate jails, morgues, houses of refuge and correction, workhouses, station houses, prisons and farm schools,” and the last, clause of Section 7 provides: “All municipal corporations shall have the following general powers, (those named in paragraph 20 included) and council may provide by ordinance or resolution for the exercise and enforcement of the same.”
The maintenance and control of workhouses devolve upon the directors of public service, as provided in Section 141, Municipal Code, or Revised Statutes, Section 1536-677. Section 1536-369 defines the persons who may be committed to a workhouse, and the following section provides that a person so sentenced “shall be received into the workhouse, and kept at hard labor therein, of if such labor can not be furnished therein, then such person may be employed at hard labor elsewhere within the limits of the corporation where such employment shall be authorized by ordinance, and shall be subject to the rules, regulations and discipline thereof, until the expiration of his sentence, when such person shall be discharged.”
Section 1536-371 provides for a cumulative sentence for second offenses by one having served *19 a workhouse sentence, and Section 1536-373 authorizes the board of public service to discharge a prisoner for good and sufficient cause. It also authorizes the board to establish rules and regulations as to- parole of prisoners, their recapture and return to workhouse, et cetera. The next section prescribes the punishment for escape or attempt to escape. There are other provisions of the statute directing the management and control of such institutions, but they are not essential to a decision of our question. '
Section 1536-375 provides that “The superintendent, assistant superintendent, and guards of the workhouse shall have such powers of policemen as may be necessary for the proper performance of the duties of their position.” These workhouse institutions, being under the control and management of the board of public service, are public institutions of the city, for the board of service is a branch of the municipal government, whose powers and functions are defined by the sáme sovereign legislative power that creates and limits the authority of the executive and legislative departments of a city government. In the execution of the powers conferred as to workhouses, and the performance of the duties imposed in caring for persons sentenced to perform labor therein, the municipal corporation is an agency of the sovereign state, in aid of the preservation of order and the punishment of offenders against the laws of the state and the ordinances of the corporation. Through such agency and others the state seeks to carry on its system of government and enforce *20 the laws and to this end it has liberally parceled out its powers to municipal corporations as the most successful means of securing good government to the people. Applying • these statutory provisions and keeping in view their evident purpose, how stands the case at bar? The workhouse is one of the penal institutions of the state and subject to its laws. The plaintiff, Bell, was an officer of that institution and while he, as sergeant of the quarry, was there injured two miles from the workhouse proper, yet he was injured in the scope of the workhouse, for the quarry was being used for workhouse purposes. His claim is not stronger than it would be had he been injured in opening a box of caps within the walls of the institution down in the city. On this ground the city defends.
However, plaintiff in error would take this case out of the above rule and parry the force of such defense by the claim, as he asserts, that the quarrying of stone was a commercial or business enterprise; that the city owned ' and operated the quarry for profit; sold stone for macadam to .contractors for building purposes in competition with other quarrymen, putting the profits in the city treasury, and for that purpose availed itself of the labor of workhouse prisoners in blasting and getting out the stone. The brief for plaintiff in error makes the very broad statement that “in operating this quarry, the city of Cincinnati not only provided work for inmates of the workhouse, but it sold the product of the quarry, namely, building stone that was gotten out, and also broken stone of various sizes, and *21 all sold by the city to contractors for building and macadam, and as to the smaller product, for surfacing streets. At the same time the city was leveling off some of its rough hilly ground-adjacent to one of its-parks,” etc.
In support of such sweeping statement, we would expect the facts to appear in the record with reasonable clearness, for the city denies ownership of the quarry, and the nature and extent of its title thereto, we are unable to find in the evidence. The brief cites but two pages of the record as containing the facts on the subject — pages 51 and 52. We have diligently searched the record for additional evidence to support the claim and have failed to find ány. Turning to those pages, we find the examination of Mr. Bell, the plaintiff below, as follows:
' “Q. Mr. Bell, at this quarry, from the time you went there on the 5th of July, I wish you would tell these gentlemen what it was they got out of tljat quarry. A. The quarried rock, and the building rock was sold to the various builders, and the small rock was hauled down to the prison sheds and the prisoners that was unable to walk to the hill, such as cripples, one-legged fellows and one-armed fellows — they were broken — ■ they hauled the rock down there for them.
“Q. Broken up into what? A. Broken up into four different sizes, very small size, little larger — there was four different sizes of them; the largest size was rock macadam, were sold to people for driveways, and the smaller lots were pads — I don’t know what they could use them for — driveways ?”
*22 It is upon this evidence that plaintiff relies to establish his claim that the city was acting in a commercial or proprietary sense, and not in a governmental capacity. We are not directed to any other evidence on* the subject, and we find no other in the record.
We think this falls far short of sustaining the contention of plaintiff in error. There is no proof that the city owned the quarry; no proof as to the nature of its title, further than that it was in the management and operation of the quarry as a part of the workhouse. There is no evidence that one penny of profit was realized on the disposition it made of stone, if that be a matter of concern. In so far as the facts inform us, or fail to inform us, the receipts for stone sold would only part pay the expenses of keeping and guarding the prisoners while engaged in the quarry, and we will hesitate to believe that the city was engaged in a commercial enterprise while it may have been endeavoring, so far as possible, to make the workhouse self-sustaining. All prison labor, including that performed in the state penitentiary, is utilized.to pay the cost of maintenance, and in so doing, the institution— the state — is not engaged in a commercial enterprise for profit. We do not take -issue with the cases cited by plaintiff in error as to the law, but he fails to furnish the facts to bring his case within any rule they lay down.
Great confidence is expressed in City of Toledo v. Cone, 41 Ohio St., 149, as sustaining plaintiff’s contention, but it can be so distinguished from the case at bar, that it is not a *23 controlling authority here. That case, as submitted to this court and as reported, involved the sufficiency of the petition in stating a cause of action; There was no bill of exceptions brought up as part of the record, and as. there was a verdict for the plaintiff in the trial court, the only question that could be reviewed in this court was, whether the petition stated a cause of action that would support the verdict. This court held that a cause of action was stated. The petition at length appears in the statement of the cause, and it presents a cause of action signally different from the one relied upon in this case. While we do not question the soundness of the judgment of this court in that case, we are quite sure that it does not rule as the law in the instant case. A careful reading of the allegations of the petition is sufficient to mark the distinction we suggest. Here, we have a case where the city through one of its departments of municipal government, is enforcing or carrying out the sentences to the workhouse of not only persons convicted by its-own police court and other local magistrates, but sentences of courts outside of Hamilton county, whose prisoners were sent to the Cincinnati workhouse to be punished. Surely in enforcing judgments of such courts, the city*acts in a governmental capacity, and in no sense in a private or proprietary relation. It was discharging public governmental functions, and the plaintiff, when he was injured, was a 'part of that government. In the brief of the city is a collection of many cases where the doctrine above announced is *24 fully discussed. In general terms, it is sufficient now to say, that the sale of some of the products ,of the quarry was merely incidental to the main purpose of conducting the workhouse as a penal institution. The law in such case may be found in Hughes v. County of Monroe, 147 N. Y., 49; Curran v. Boston, 151 Mass., 505; Haley v. Boston, 191 Mass., 291; Clodfelter v. State, 86 N. Car., 51. These cases cite many others of like force and character.
There is another view of this case that compels our attention. Aside from legal considerations in which we have indulged, has the plaintiff made out a case on his own evidence, and which was challenged as insufficient by the motion to direct a verdict? His counsel in .the brief states the case as follows: “Just prior to the time Bell sustained the injuries complained of * * * Wood (who was the regular man to handle the caps) left the quarry. It became necessary on this date to open a box of powerful percussion caps to fire .a blast, and Bell in the discharge of his duty attempted to do this. The box containing caps was like a blacking box and the lid became wedged as it was half off. Bell, in his ignorance, inserted a thin strip of sheet iron under the raised edge of the lid to pull it off, and the explosion occurred, and Bell was horribly mutilated.”
This statement is based on the testimony of the plaintiff where he describes what he was doing when injured, as bn pages '39 and 40 of the printed record. “When I took charge of the hill, this colored man found a box had a few *25 caps in it, just how many I don’t know. It was the first caps I ever saw, the first box I ever saw. And the day I went down to get this material to make that blast there were no more caps in the box, but the institution had bought a box of caps a few days before and had put them in this magazine; and this was a round box, something similar to a ten cent blacking box, as near as I can remember. I took it out arid tried to remove the lid by twisting and pulling; the lid was very tight.”
“Q. Had you ever before that time opened a box like that? A. I had never seen a box.
“Q. Had you ever seen a box like that? When you went up there you found a box that had been opened with these few caps? A. New caps. •
“Q. But at this time had they been used? A. They had all been used up.
“Q. Tell the jury just exactly what you did. A. Well, I tried to remove the lid, twisting* it around that way, and the lid fit down to the shoulder, probably a half inch on the box, making it very hard to remove. I twisted the lid around until it got up to the top of the box on one side, and on the other side to the shoulder in a way that I could neither push it back on or pull it off. So I reached over to the tool bench, picks up a little piece of — I couldn’t say exactly what it was; it was a piece of sheet iron or something, a very light piece of material, and gets under the edge of this lid and pulled the lid off; and whatever caused the explosion I will never be able to tell you, but I made a pull or two at *26 the lid and the explosion came. Whatever caused it I will never be able to tell.”
This is plaintiff’s account of the transaction. Two or three witnesses testified that Bell picked up a small tack-hammer and pounded the lid. But we accept his own version as the most favorable to his claim. He was a man of mature age and had been at the quarry as guard for about two months and knew that drilling for blasts and blasting the rock were common occurrences, and that in blasting high explosives were used; and knew that the caps like those he exploded were in common use to set off the blasts. On this occasion he was aware that some of these caps were needed to set off the blast, and he surely knew that the caps themselves were of an explosive character in order to be of practical use in making a blast. He says he knew nothing about the caps; that no one warned or instructed him in reference to the dangers of handling the caps or in the way of removing the lids from the boxes. On the other hand, no one ordered or directed him to open the box. It was his own voluntary act, and he selected the manner of removing the lid. The method was entirely his own. While perhaps he did not know the danger of a mistaken method, it is evident that he did know that such percussion caps contain elements of danger, and he thought his course of removing the lid was a proper one. As no superior seems to have been present, and no one suggested his method of performance, it was of his own selection.
*27 It seems to. us that he failed to make a case on the facts and therefore there was nothing to submit to the jury, and the trial court should, for this reason, as well as the first, have directed a verdict. Entertaining these views, it is not necessary to consider the charge of the court or its refusal to charge, and the judgment of the court below is affirmed.

Judgment affirmed.

Crew, C. J., Summers, Spear and Shauck, JJ., concur.